858 F.2d 712
 57 USLW 2223, 35 Cont.Cas.Fed. (CCH) 75,563,
Prod.Liab.Rep.(CCH)P 12,058
 Albert LOPEZ and Shirley Lopez, Plaintiffs,
and
Raymark Industries, Inc. and Eagle-Picher Industries, Inc.,
Defendants/Third- Party-Plaintiffs/Appellants,
v.
A.C. & S., Inc.; American Asbestos Textile Corp., a/k/a
Amatex Corp.; Armstrong Cork, Inc.; Asarco, Inc.; Carey
Canada, Inc.; the Celotex Corp., successor in interest to
Philip Carey Manufacturing Co., Philip Carey Corp., Briggs
Manufacturing Co., and Panacon Corp.; Combustion
Engineering Inc.; Crown Cork & Seal Co.; Fibreboard Corp.;
the Flintkote Co.; Forty-Eighty Insulation, Inc.; GAF
Corp., successor by merger with Ruberoid Co.; Garlock Inc.,
Johns-Manville Sales Corp.; J.P. Stevens, Inc.; Keene
Corp., successor by merger with Baldwin-Ehert-Hill a/k/a
Asten Hill; Nicolet Industries; Owens-Corning Fiberglas
Corp.; Owens-Illinois Corp.; Owens Illinois Glass;
Pittsburgh Corning Corp.; Raybestos-Manhattan; Southern
Textile; Standard Asbestos; Union Asbestos; Rubber Co.
a/k/a Unarco Industries, Inc., Defendants,
v.
UNITED STATES of America, Third-Party-Defendant/Appellee.
 Appeal Nos. 87-1543, 87-1544.
 United States Court of Appeals,
Federal Circuit.
 Sept. 28, 1988.
 
 Philip A. Talmadge, Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S., Seattle, Wash., and Joe G. Hollingsworth, Spriggs, Bode & Hollingsworth, Washington, D.C., argued for defendants/third-party-plaintiffs/appellants. Allen R. Sakai, of Karr, Tuttle, Koch, Campbell, Mawer, Morrow & Sax, P.S., and Paul G. Gaston and Edward M. Fogarty, Spriggs, Bode & Hollingsworth, were on the brief, of counsel.
 David S. Fishback, Sr. Trial Counsel, and H. Michael Semler, Department of Justice, Washington, D.C., argued for third-party-defendant/appellee. With them on the brief were Richard K. Willard, Asst. Atty. Gen., J. Patrick Glynn, Director, Harold J. Engel, Deputy Director, JoAnn J. Bordeaux, Asst. Director and Henry Miller, Trial Atty., Gene S. Anderson, U.S. Atty., and Joseph B. Cox, Jr., Asst. Director, Torts Branch, Civ. Div.
 Robert M. Bruskin, James F.C. Worrall and Harvey G. Sherzer, Howrey & Simon, Washington, D.C., Dennis H. Markusson, Robert D. Batson, Nancy E. Stead, and Richard E. Maunier, Manville Corp., Denver, Colo. were on the brief, for amicus curiae Johns-Manville Sales Corp.
 Paul A. Zevnik, Kaye, Scholer, Fierman, Hays and Handler, Washington, D.C., and Max Gitter and Stuart M. Cobert, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, were on the brief, for amicus curiae GAF Corp.
 Before MARKEY, Chief Judge, RICH and ARCHER, Circuit Judges, and NICHOLS and BENNETT, Senior Circuit Judges.
 NICHOLS, Senior Circuit Judge.
 
 
 1
 This is a test case,* appealed from the United States District Court for the Western District of Washington (McGovern, C.J.), Civil Action No. C84-155M, representative of numerous claims by present or former workers at the Puget Sound Naval Shipyard (PSNS), or their widows, against companies which supplied to the United States Navy products for insulation on shipboard that contained asbestos. Lopez was a civilian pipe fitter, pipe coverer, and insulator at PSNS from 1947 to 1984. Of numerous defendants, Raymark and Eagle-Picher settled with Lopez for $7,200 and $10,000, respectively, for disabilities supposed to result from breathing air-borne asbestos dust, presumably, for purposes of this case, from products supplied to PSNS by Raymark and Eagle-Picher. Lopez also received an award from his employer, the United States, under the Federal Employees Compensation Act (FECA), 5 U.S.C. Secs. 8101-93, but pursuant to section 8132, was required to refund it. See United States v. Lorenzetti, 467 U.S. 167, 104 S.Ct. 2284, 81 L.Ed.2d 134 (1984). Raymark and Eagle-Picher joined the United States as a third-party defendant and seek to be indemnified or reimbursed, in whole or in part, for their settlement payments and litigation expenses.
 
 
 2
 Lopez originally filed his suit in state court, but defendants removed it to federal court (W.D. of Washington), on diversity. The asserted grounds of federal liability to Raymark and Eagle-Picher were the Tucker Act, 28 U.S.C. Sec. 1346(a)(2), as to claims founded on contracts implied in fact, and the Federal Tort Claims Act (FTCA), 28 U.S.C. Secs. 1346(b) and 2671-80, as to claims sounding in tort. The government, having successfully invoked 5 U.S.C. Sec. 8132 to shift its loss to Raymark and Eagle-Picher, naturally does not welcome their effort to shift it back under the above two statutes. Its motion to dismiss or for summary judgment elicited a judgment of dismissal by the district court, which is the decision the appeal requires us to review. It is reported as Lopez v. Johns-Manville, 649 F.Supp. 149 (W.D.Wash.1986).
 
 
 3
 The appeal was originally filed with the Ninth Circuit, but is here because of the presence of Tucker Act claims and the rule of construction of 28 U.S.C. Sec. 1295(a)(2) laid down in United States v. Hohri, 482 U.S. 64, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987). See In re All Asbestos Cases, 849 F.2d 452 (9th Cir.1988). The briefs were originally prepared for the Ninth Circuit and came here with the rest of the case. They were supplemented here. There are amicus briefs. We have carefully considered all briefs and heard oral argument on behalf of Raymark and Eagle-Picher separately. Our conclusion is that we affirm the judgment of the district court, though not in all respects on the same reasoning. As to the Tucker Act claims, we affirm primarily on the basis of our own case law as we are meant to be the primary or sole source of case law construing that act since our establishment. United States v. One (1) 1979 Cadillac Coupe de Ville, 833 F.2d 994, 997 (Fed.Cir.1987). As to the Tort Claims Act claims, we look primarily to the law of the Ninth Circuit, since such claims are here only as pendants to other claims. Molins PLC v. Quigg, 837 F.2d 1064, 1066, 5 U.S.P.Q.2d 1526, 1527 (Fed.Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 2822, 100 L.Ed.2d 923 (1988).
 
 Discussion
 Tucker Act Jurisdiction
 
 4
 Since the statutory basis of our jurisdiction is the presence of Tucker Act claims under 28 U.S.C. Sec. 1346(a)(2), we consider them first. The government, of course, purchased products containing asbestos under written contracts and purchase orders, but the case has proceeded in a partial vacuum so far as concerns the specific texts, and in view of the lapse of time, it may be impossible now to produce them all. Some are known. It is reasonable to suppose, and the district court did suppose, they specified what asbestos the purchased products should contain, as asbestos was the most effective insulating element, and its perils, that made its use so undesirable, were only beginning to be known at the time of Lopez's first employment. On the other hand, from the arguments on behalf of Raymark and Eagle-Picher, we assume it is not now contended that the contracts or purchase orders contained any written warranties to sellers; it would be surprising indeed to see express warranties running from the buyer to the seller, especially when their legality would have been in doubt, as the able district court supposed. We are considering implied warranties.
 
 
 5
 The theory is that in specifying asbestos, the government made an implied warranty to sellers that its own use of the products would not expose the sellers to unforeseen defective product liabilities to persons who might be injured by breathing clouds of asbestos dust, lethal as we now know such clouds to be.
 
 
 6
 The decision of the district court implies that a contract action on such a theory is simply not available to sellers to the government under the Tucker Act. If the decision does not rest on a broad range of possible factual assumptions, under the pleadings, it cannot be sustained.
 
 
 7
 The court quotes Santisteven v. Dow Chemical Co., 506 F.2d 1216 (9th Cir.1974), which rejects the supposed liability of a buyer to a seller, not to use a dangerous substance in a manner to expose the seller to liability to the buyer's employees. The analysis, however, deals with tort law and that of contracts implied at law, while for Tucker Act jurisdiction the claimant must allege a contract obligation implied in fact. The Tucker Act, as the court correctly states, does not confer jurisdiction of claims against the United States on contracts, implied at law, they must be implied in fact. Hatzlachh Supply Co. v. United States, 444 U.S. 460, 100 S.Ct. 647, 62 L.Ed.2d 614 (1980); Merritt v. United States, 267 U.S. 338, 45 S.Ct. 278, 69 L.Ed. 643 (1925).
 
 
 8
 The asbestos suppliers, in the numerous cases now pending which seek indemnity from the United States against their liability to United States employees, frequently mention two cases that were brought under the Tucker Act, and do enforce warranty contracts implied in fact, running from buyer to seller. We will add a third, and there are others.
 
 
 9
 The first and most famous is United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). Spearin had contracted to build a drydock at a navy yard (as Naval shipyards used to be called). The government, according to its custom, required construction contractors to build according to very detailed plans and specifications. Spearin was required to relocate a sewer according to plan, but the plan was defective in that it required Spearin to make the sewer, as relocated, discharge into another sewer which, as the plan failed to show, was itself blocked. The result was disaster. The Court (Brandeis, J.), said 248 U.S. at 136, 39 S.Ct. at 61:
 
 
 10
 But if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications.
 
 And, 248 U.S. at 137, 39 S.Ct. at 61:
 
 11
 But the insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that, if the specifications were complied with, the sewer would be adequate. This implied warranty is not overcome by the general clauses requiring the contractor, to examine the site, to check up the plans, and to assume responsibility for the work until completion and acceptance. [Footnotes omitted.]
 
 
 12
 The case establishes a principle of broad application, but it is obvious a construction contract, with its massive detail all prescribed by the owner, supports a fact implication in a way a mere supply contract could hardly ever do, except one which exacts a like conformity to the buyer's prescription of detail. One which did is also frequently cited: Ordnance Research, Inc. v. United States, 221 Ct.Cl. 641, 609 F.2d 462 (1979). The contract was for production of igniters for fire bombs. This involved blending some very volatile explosives. The government had experience making these igniters; the plaintiff had none. The government provided very detailed specifications how to do it, but they were defective and in following them, plaintiff experienced a series of disastrous explosions with loss of life. The court held the government warranted--as we have seen, by an implication of fact--that if its instructions were followed, safe blending could be achieved. The specifications were in fact defective and in breach of the warranty.
 
 
 13
 In USA Petroleum Corp. v. United States, 821 F.2d 622 (Fed.Cir.1987), the government contracted for several deliveries of petroleum by the vendor. It required that it determine the quantity delivered by each tanker load according to measurement means it provided. The means were defective and overpayments ensued which the contractor passed on to its suppliers and could not recover, yet the government demanded refund of its overpayments when the defects were at length discovered. It was not a very difficult deduction of fact, that in exacting use of its measurement means, the government impliedly warranted that its measurements means were correct.
 
 
 14
 It was characteristic of these cases that the circumstances strongly supported a factual inference that a warranty was implied. The counsel for asbestos suppliers here seem to think it is enough for a Spearin warranty that the government specified any characteristic at all in the merchandise it purchased. They do not know and cannot tell us whether the government specifications differed at all from those of private customers of Raymark and Eagle-Picher, or if they did, whether the difference related to the asbestos content of the material supplied. We know, as a matter of judicial notice today, that all insulating material containing asbestos is hazardous, that supplied to government and private customers alike. We can assume this was not so well known when the material was ordered. Even in a "reverse warranty" claim by an asbestos supplier against a private company, where the concept of implied warranty is not confined to implied in fact cases, it has been held the alleged warranty cannot be implied. White v. Johns-Manville Corp., 662 F.2d 243 (4th Cir.1981).
 
 
 15
 This court has held that a Spearin-type warranty is implied only in design specifications, not performance specifications. Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1583 (Fed.Cir.1987). It is not explained how any supposititious specifications for asbestos-containing insulating material could have been of the design type. Judge McGovern has held the government asbestos specifications were performance specifications, and this holding is not appealed. When a construction contract is not involved, as in Ordnance Research, some other provision telling just how to do the job, takes the place of literal design. The contractor has a right to rely on an "indicated method of manufacturing the end product." Natus Corp. v. United States, 178 Ct.Cl. 1, 371 F.2d 450, 455 (1967). It is not shown how the government could have supposed it needed to tell Raymark and Eagle-Picher how to make asbestos insulation, or how they needed to rely on such instructions.
 
 
 16
 In the absence of allegation or showing of circumstances requiring a conclusion that a Spearin warranty was implied, the asserted warranty would be, if it had judicial approval, implied at law, not fact, and a Tucker Act court would lack jurisdiction to imply it. As a matter of an implication of fact, an implied warranty relating to the use by the buyer after delivery, and warranting it would not harm the seller is novel, and no reason is shown why anyone could have so supposed at the date of sale by any inference from the circumstances. It would be just as reasonable for the parties to the sale to have implied a warranty by the seller, that apart from dangers the seller warned of, the insulation would not endanger the buyer or its employees. Either way it would be a warranty implied in law, not fact.
 
 The Anti-Deficiency Act
 
 17
 The district court also relied on the Anti-Deficiency Act, 31 U.S.C. Sec. 1341, which provides that no government official may make or authorize an expenditure in excess of an available appropriation, or make a contract obligating money before an appropriation is made unless authorized by law. The reasoning of the court is that an express warranty to suppliers of asbestos products, of the kind asserted, would be illegal, and therefore an implied warranty must be so too. We have doubts about this, and as we need not rely on it, we do not do so. An express warranty would be a thing of value in addition to the purchase price. The contracting officer could pay money out if he found the warranty required it. On the other hand, a Spearin-type implied warranty is, if breached, enforceable only in the courts. At times, as in Ordnance Research, supra, it is enforceable under contract changes articles and no breach of the contract necessarily occurs, but if a contracting officer were going to issue a change order settling a claim, he would be limited to appropriated funds then available. However, appeal boards by the Contract Disputes Act of 1978, 41 U.S.C. Sec. 607(e), can grant any relief the Claims Court could grant, i.e., including damages in breach cases. There is a standing appropriation to pay court judgments and appeal board awards, 31 U.S.C. Sec. 1304, so courts and boards, in rendering judgment, are not required to investigate whether program funds are available. In the circumstances, we are reluctant to found our holding on the Anti-Deficiency Act, and to do so would severely hamper the enforcement of Spearin-type warranties in the courts. Our appreciation of the bizarre and novel nature of the "reverse warranty" here asserted, and its lack of support in the alleged facts or the court decisions, does not require recourse to the Anti-Deficiency Act to persuade us that the Tucker Act does not provide means to enforce the alleged warranty here. If implied at all, it is not implied in fact. Raymark and Eagle-Picher have not stated claims on which relief can be granted.
 
 Special Relationship
 
 18
 Raymark and Eagle-Picher have, in this case, kept discussing an alleged "special relationship," i.e., certain special circumstances whose alleged existence fixes government liability. We must not forget, however, that absent an effective consent to be sued, the United States cannot be made a defendant, third party, or otherwise, in any court. The consents we operate under here are the Tucker Act and the FTCA. No others are alleged. The grievance seems to be in real terms that the United States knew more about the hazards of asbestos than it ever disclosed to its suppliers. If, supposedly, they had known all the government knew, they would have gone out of the asbestos business at once, and saved themselves untold liability, or else would have purchased all the insurance available and passed the cost on to the United States and other customers in sharply higher prices.
 
 
 19
 On motion to dismiss or for summary judgment, we may have to suppress our wonderment that anyone could have known more about the hazards of asbestos than those responsible companies who used it as raw material in the production of insulation. We must assume the government did know things it did not reveal, and that it used a defective product in ways that added to the hazard, but were not known to suppliers. We must also disregard the results of actual trials which have dealt with this imputation, as they are not part of the present record.
 
 
 20
 So far as this contention asserts an implied warranty, it is dealt with already in our section, supra. There is, also, case authority under the Tucker Act applying a different but related theory. Under these cases, nondisclosure to a bidder at the time of his bid of information essential to successful performance of the construction is treated at times as a breach. Examples are Hardeman-Monier-Hutcherson v. United States, 198 Ct.Cl. 472, 458 F.2d 1364 (1972); J.A. Jones Constr. Co. v. United States, 182 Ct.Cl. 615, 390 F.2d 886 (1968); Helene Curtis Industries, Inc. v. United States, 160 Ct.Cl. 437, 312 F.2d 774 (1963). In American Ship Bldg. Co. v. United States, 228 Ct.Cl. 220, 654 F.2d 75 (1981), the court set limits on the scope of breach liability for nondisclosure of superior knowledge. It held the doctrine is generally applied when a contractor (1) undertakes to perform without vital knowledge of a fact that affects performance costs or direction, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information. Since the government is entitled to presume that one who bids on a government invitation knows his own capabilities and has ascertained he will be able to produce, and at what cost, it would be up to the contractor, complaining of a breach by nondisclosure, to produce specific information to back up his contention.
 
 
 21
 The government might reasonably suppose Raymark and Eagle-Picher knew enough about asbestos and its perils not to need to learn more about it from the government. They would after all not be held liable to pay anything on any asbestosis or lung cancer claims if they had not marketed a defective product. They say the buyer owed them a duty to tell them their product was defective, intrinsically or as actually used. Such a contention is new to the "superior knowledge" doctrine and does not fit it at all well. It does not deal, for example, with how the government is supposed to know the supplier of asbestos needs information about asbestos it does not have. Surely a statement by a supplier to the government when the material was delivered would have attracted notice and would not have been forgotten. We must presume that government officials acted in good faith, the contrary not being alleged. Acting in good faith, they could not have knowingly exposed their own employees to undue asbestos hazards. Maybe they had a duty to know more than they did, e.g., to follow up clues to danger they actually had received. Raymark and Eagle-Picher have asserted then, not only a duty of the customer to inform the supplier that his product is defective, but a duty to find out what he does not already know. This does not fit the superior knowledge doctrine and cases exactly like a glove. Then there is the question what the contract specifications actually said that misled the contractor.
 
 
 22
 We think the case law dealing with a government breach of a contract by nondisclosure of superior knowledge cannot be made to support the claims here in suit without so drastic a restructuring that we would be engaging in judicial legislation. We note that the Supreme Court has recently considered the plight of a government contractor exposed to liability to third persons from manufacturing defective products to government specifications. Boyle v. United Technologies Corp., --- U.S. ----, 108 S.Ct. 2510, 101 L.Ed.2d 442 (1988). The Court extends the government's immunity to the contractor under carefully limited conditions in what is called the "government contractor defense." Before us the effort is to reduce the government's immunity and it appears logically inconsistent with the Supreme Court's approach. If the appellants Raymark and Eagle-Picher were really markedly exposed to Lopez and his future claims, and so many other claimants, by reason of conforming to government specifications and, if the otherwise carefully prescribed conditions are met, there should be no damage awards on which to base claims for government indemnity or contribution. There then is a conflict of logic between the government contractor defense and the logic on which the third party alleged liability of the government here is based. This is a factor counseling caution when we are asked to extend Tucker Act liability on new and novel grounds, only superficially based on case law as known hitherto. We are not to be understood as saying the government contractor defenses ought to have defeated Lopez's claim. No such issue is before us and we do not pass upon it. Judge McGovern has held the contrary, chiefly on the ground the involved specifications displayed before him were performance, not design specifications.
 
 Federal Tort Claims Act
 
 23
 The district court also gave careful consideration to the Federal Tort Claims Act, which at 28 U.S.C. Sec. 2674, makes the United States liable respecting tort claims to the same extent as a private individual under like circumstances. By 28 U.S.C. Sec. 1346(b), the circumstances must be that the supposititious private individual "would be liable to the claimant in accordance with the law of the place where the act or omission occurred." Since United States v. Yellow Cab Co., 340 U.S. 543, 71 S.Ct. 399, 95 L.Ed. 523 (1951), it has been settled that in a private tort case, a person may bring in the United States as third-party defendant for indemnity or contribution if the United States was wholly or in part at fault. As there has been no trial, the fault of the United States has not been determined, but a problem here is, assuming it was at fault, Lopez was one of its employees and it is provided by FECA, 5 U.S.C. Sec. 8116(c), that the liability of the United States under that act to the injured employee or his legal representative, spouse, dependants, etc., shall be exclusive of all other liability to such claimants "in a direct judicial proceeding."
 
 
 24
 The United States, as already stated, has recovered its compensation paid to Lopez because of his other recoveries, but this is not of legal importance. In Lockheed Aircraft Corp. v. United States, 460 U.S. 190, 103 S.Ct. 1033, 74 L.Ed.2d 911 (1983), the Supreme Court held that Lockheed, having been sued by the administrator of a deceased federal employee compensated under FECA, could implead the United States as a third-party defendant, and was not barred by section 8116(c). The result on remand would depend on the validity of the "underlying substantive claim," and was not decided. The district court and the parties assume that Lockheed does not make the United States liable in this case on the underlying claim, and that will depend on how one identifies the private individual and what local law prescribes as to his liability. As to that, there are three theories that, (1) judge-made admiralty law will govern, (2) Lopez was a maritime worker and the liability would be that of a "negligent shipowner" under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. Sec. 901 and ff (LHWCA), because local law would have to step aside even though the injury was suffered in the State of Washington, and (3) the LHWCA does not apply and local Washington worker's compensation law will determine liability, because Lopez was not a maritime worker.
 
 
 25
 These issues are not confided to us, as Tucker Act claims are, as the intended sole source of appellate law, and as stated we look for guidance to Ninth Circuit case law, but such law does not take us to the end of our task. Before Hohri, the parties elaborately briefed this case, and at impressive length, for the Ninth Circuit, whose tolerance for prolixity they must consider to surpass ours. They must have supposed, and by their arguments and citations obviously did suppose, that the Ninth Circuit would be unable to find guidance in its own precedents. Under the circumstances, we must try to determine what the Ninth Circuit would have decided.
 
 
 26
 (1) Theory 1 is that product liability can be asserted on behalf of a pipe fitter against a producer of unsafe asbestos products under traditional judge-made admiralty law, if the pipe fitter was building or repairing vessels on navigable waters. Presumably the manufacturer could then pursue indemnity from the United States under the Lockheed doctrine, and section 8116(a) would not suffice for a defense, so far as the vessels were government owned. This theory fails at its first step, however, in the Ninth Circuit, which in two carefully considered decisions has held that admiralty jurisdiction is wanting (a) over new vessel construction, because new construction is traditionally nonmaritime and not subject to admiralty law, Owens-Illinois, Inc. v. United States District Court, 698 F.2d 967 (9th Cir.1983), and (b) over vessel repair, so far as concerns product liability to a pipe fitter, at least, because to distinguish between the same pipe fitter's work over the years between his work on new vessels, and on repair, would be "a mechanical analysis" (and besides, one would think an unpracticable distinction to draw as a factual matter). Myhran v. Johns-Manville Corp., 741 F.2d 1119 (9th Cir.1984). The court relies on Executive Jet Aviation, Inc. v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), as authority to reject mere location on the water as a test of maritime activity and to consider also the nature of the work the pipe fitter performs. Of course, in an office building it would be little different. The pipe fitter is not a seaman, nor does he do work traditionally done by seamen. The United States was not a party to those cases, so there is no question as to the jurisdiction of the Ninth Circuit to render the decisions. Authority from other circuits is not needed by us, but the Ninth Circuit itself cites Harville v. Johns-Manville Corp., 731 F.2d 775 (11th Cir.1984), in which a still more elaborate analysis may be found. See also Austin v. Unarco Industries, Inc., 705 F.2d 1, 8 (1st Cir.1983); Keene Corp. v. United States, 700 F.2d 836 (2d Cir.), cert. denied, 464 U.S. 864, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983) ("where a group is composed of workers with and without maritime status [pipe fitters] Admiralty jurisdiction does not exist as to the group." Id. at 844.) The Ninth Circuit has not taken this stand alone, and we have found no authority to the contrary, except White v. Johns-Manville Corp., 662 F.2d 234 (4th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982). This decision, however, is followed by White v. Johns-Manville Corp., 662 F.2d 243 (4th Cir.1981), which denies the asbestos manufacturers indemnity for their tort liability from the shipyard involved, the Newport News Shipbuilding and Drydock Co., and thus they cannot invoke the Fourth Circuit for more than the first step where they need a second to be in a good position in this court. If our view matters, we agree with the Ninth Circuit that the first step fails: the pipe fitter's claim is not maritime whether he worked on new construction or repair of vessels.
 
 
 27
 (2) The LHWCA is a sweeping piece of legislation which, as amended in 1972, does two things--first, it requires that employers of certain maritime and harbor workers, including those employed in "repairing or building a vessel" obtain insurance to protect their workers against disability or death incurred in course of employment, payable without fault (sections 903-904). An employer who fails to do this is liable under section 905(a) in law or admiralty and is denied several defenses. None of this applies directly to United States Government employees, such as Lopez, who have coverage under other law. Under section 905(b), in case of the "negligence of a vessel," the vessel may also be sued, the employer is not liable to the vessel, and the vessel's former absolute liability under "warranty of seaworthiness" is eliminated.
 
 
 28
 The asbestos manufacturer's argument is that Lopez worked for the United States in its capacity as a shipowner, and that a negligent private party, a shipowner, is the analogous private person whose liability is to be determined by the "law of the place" of 28 U.S.C. Sec. 1346(b), the "law of the place" not being law of the State of Washington, where the Puget Sound Naval Shipyard is located, but the LHWCA. While the United States is not directly liable to its own civilian employees if injured on its vessels because of 5 U.S.C. Sec. 8116(c), pursuant to the Lockheed doctrine it is liable for contribution on account of its own negligence if its employees are able to enforce liability against third persons for their injuries. According to this theory, recourse to state law is preempted because federal law, the LHWCA, covers the case.
 
 
 29
 There are numerous conceptual difficulties with this position. The hardest to overcome is, in our view, that section 905(b) is not coextensive in its coverage of employees with those for whom the employer must obtain coverage under section 903. Under that law, those engaged in shipbuilding are covered and must be insured. However, eligibility for worker's compensation under section 903 is not the same as, and may be broader than, general maritime jurisdiction. Rohde v. Southeastern Maritime Drilling Co., 667 F.2d 1215 (5th Cir.1982). Negligence claims under section 905(b), are those covered by federal maritime principles. Richendollar v. Diamond M. Drilling Co., 819 F.2d 124 (5th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987); Drake v. Raymark Industries, Inc., 772 F.2d 1007, 1011 (1st Cir.1985). If there was no intention to broaden the coverage of the judge-made admiralty law concerning vessel "unseaworthiness," and we perceive none in the act, then all the regional circuit cases holding that suits by shipyard pipe fitters for asbestosis do not lie under admiralty principles, likewise preclude indemnity liability under section 905(b). The purpose of section 905(b) is shown in Drake to have been to lessen the vessel's liability for unseaworthiness as a matter of strict liability and to restrict such liability to cases of negligence. Accordingly, the First Circuit has followed its own Drake decision with In re All Maine Asbestos Litigation (PNS cases), 772 F.2d 1023 (1st Cir.1985), cert. denied, 476 U.S. 1126, 106 S.Ct. 1994, 90 L.Ed.2d 675 (1986), which deals with asbestos claims of federal employees, civil servants, rising out of their employment at the Portsmouth Naval Shipyard. These claimants are, legally, identically situated with Lopez's claim.
 
 
 30
 The First Circuit passes over, as can we, whether an unequivocal consent to liability of the United States is expressed with respect to indemnification or contribution against claims by federal workers, where the LHWCA itself provides in 33 U.S.C. Sec. 903(b) [Sec. 902(a)(2) before 1984]:
 
 
 31
 No compensation shall be payable in respect to the disability or death of an officer or employee of the United States or any agency thereof.
 
 
 32
 As to this, we meet ourselves coming back as appellant refers us, of course, to the case of the private shipowner postulated under the FTCA whose employees are not federal employees. But if consent to indemnification claims is granted at all, under these circumstances, it is surely not granted unequivocally. Cf. United States v. Testan, 424 U.S. 392, 399, 96 S.Ct. 948, 953-954, 47 L.Ed.2d 114 (1976). We are inclined to believe that a suit for indemnification or contribution for liabilities incurred to federal employees for their breathing of asbestos, is unconsented even when the LHWCA is read with the FTCA to refer to a private employer.
 
 
 33
 In Amell v. United States, 384 U.S. 158, 163, 86 S.Ct. 1384, 1387, 16 L.Ed.2d 445 (1966), it is held respecting pay claims of seamen who are civil servants employed on government-owned noncombat vessels, that Congress thought of them as government employees who happened to be seamen rather than as seamen who by chance worked for the government. The traditional exclusive admiralty jurisdiction of seamens' wage claims did not extend to them; they could sue under the Tucker Act like other civil servants. Accordingly, it would seem that Lopez was a civil servant rather than a longshore and harbor worker, for purposes of statutory coverage, that is, the occasional situs of his work on shipboard does not establish LHWCA coverage.
 
 
 34
 We believe the Ninth Circuit would so hold, in view of its first step, respecting traditional admiralty coverage of pipe fitters working in shipyards, supra.
 
 
 35
 (3) If federal maritime jurisdiction fails, whether derived from judge-made admiralty law, or from the LHWCA, we agree with the trial court that one must look to the law of the State of Washington to determine whether
 
 
 36
 the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.
 
 
 37
 28 U.S.C. Sec. 1346(b).
 
 
 38
 Under that law, the trial court convincingly shows that, absent any express contract commitment, an employer who carried appropriate workmen's compensation insurance would not be liable to indemnify third parties who were obliged to pay damages to the worker for having negligently caused or contributed to his injury. We need not add anything to his able analysis and citations. We believe, moreover, the Ninth Circuit would extend to Judge McGovern's decision the customary deference when it is a matter of a United States District Judge construing the law of his home state. Of course, in case of any contract commitment, the result might be different, but then we have a case not sounding in tort, and it is the FTCA we are now construing.
 
 Conclusion
 
 39
 Since the defendants/appellants, Raymark and Eagle-Picher, are unable to state a cause of action under either the Tucker Act or the FTCA against the United States as third-party defendant for indemnity or contribution, the decision of the United States District Court for the Western District of Washington must be affirmed, and the United States dismissed as a party to the action.
 
 
 40
 AFFIRMED.
 
 
 
 *
 The only parties on appeal are Raymark and Eagle-Picher